**No. 2015-1731**

# United States Court of Appeals for the Federal Circuit

TROY R. NORRED, M.D.,

*Appellant,*

v.

MEDTRONIC, INC., MEDTRONIC VASCULAR, INC.,
AND MEDTRONIC COREVALVE, LLC,

*Appellees.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2014-00110

## APPELLEES' BRIEF

Jack S. Barufka
PILLSBURY WINTHROP
   SHAW PITTMAN LLP
1650 Tysons Blvd, 14th Floor
McLean, VA 22102
703-668-0664

John C. O'Quinn
William H. Burgess
KIRKLAND & ELLIS LLP
655 15th St., N.W.
Washington, DC  20005
(202) 879-5000

Evan Finkel
PILLSBURY WINTHROP
   SHAW PITTMAN LLP
725 S. Figueroa St., Suite 2800
Los Angeles, CA 90017
213-488-7307

*Counsel for Appellees*

November 6, 2015

**U.S. Patent No. 6,482,228, claims 16-19 (A475):**

**16.** An aortic valve for regulating a blood flow through an aortic channel surrounded by an aortic wall upon placement therein, said valve comprising:

> a ring member having a circumference adapted to seat about an aortic wall surrounding an aortic channel, said ring including an aperture for blood flow therethrough;
>
> a membrane having first and second spaced-apart open ends, said membrane made of a material resistant to a fluid flow therethrough; and
>
> means for mounting said first open end of said membrane about said ring aperture with said second open end displaced therefrom, said means moving said membrane second end between a first open position to allow a blood flow therethrough and a second closed position to preclude a blood flow therethrough.

**17.** The aortic valve as claimed in claim **16** wherein said mounting means comprises at least one arm having a first end hingedly secured to said ring member and a free end spaced therefrom, said first end of said at least one arm secured to said first end of said membrane, said free end of said at least one arm secured to said second end of said membrane, said at least one arm responsive to a blood flow within the channel for movement with said membrane between said first open and second closed positions.

**18.** The aortic valve as claimed in claim **17** wherein said at least one arm extends generally along a path of said blood flow at said first open position, and generally traverses a blood flow path when at said second closed position.

**19.** The aortic valve as claimed in claim **16** further comprising means for maintaining said ring member in said seat about the aortic wall.

# CERTIFICATE OF INTEREST

**1.    The full name of every party represented by us is:**
Medtronic, Inc., Medtronic Vascular, Inc., and Medtronic Corevalve, LLC

**2.    The name of the real party in interest is:**
Medtronic, Inc., Medtronic Vascular, Inc., Medtronic Corevalve, LLC, and Medtronic plc.

**3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:** Medtronic Vascular, Inc. and Medtronic Corevalve, LLC are wholly-owned subsidiaries of Medtronic, Inc.  Medtronic plc wholly owns and is the ultimate parent of Medtronic, Inc.  Medtronic plc is a publicly traded corporation.  No other publicly traded corporation owns 10% or more of the stock of Medtronic plc.

**4.    The names of all law firms and the partners or associates that appeared for the party now represented by us in the agency or are expected to appear in this Court are:**

Kirkland & Ellis LLP: John C. O'Quinn and William H. Burgess

Pillsbury Winthrop Shaw Pittman LLP: Jack S. Barufka and Evan Finkel

# TABLE OF CONTENTS

Statement of Related Cases ..................................................................... vi

Preliminary Statement........................................................................... 1

Statement of the Issues......................................................................... 2

Statement of the Case .......................................................................... 3

    A.   Aortic Valves ............................................................... 3

    B.   The '228 Patent .......................................................... 5

    C.   *Inter Partes* Review Proceedings .......................................... 10

        1.   Anticipation by DiMatteo ............................................. 11

        2.   Norred's Motion to Amend ........................................... 15

Summary of the Argument ................................................................... 17

Standard of Review ............................................................................. 18

Argument ......................................................................................... 19

I.   The Board Correctly Ruled that DiMatteo Anticipates Claims 16-19.......................................................................................... 19

    A.   The Board Correctly Found that DiMatteo is Prior Art....... 19

    B.   The Board's Finding that DiMatteo Discloses the Claimed "Ring Member" Should be Affirmed. ..................... 38

        1.   DiMatteo Discloses a Pliable "Ring Member." ............ 39

        2.   The Claims Do Not Require a "Pliable" Ring Member, In Any Event. ............................................... 45

II.   The Board Correctly Denied Norred's Motion to Amend. ............. 50

    A.   Legal Standards for Motions to Amend in *Inter Partes* Reviews................................................................... 50

    B.   The Board Correctly Denied Norred's Motion to Amend Claim 16.................................................................... 52

Conclusion......................................................................................... 62

# TABLE OF AUTHORITIES

## CASES

*Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952 (Fed. Cir. 2014) ............. 19, 21

*Amgen v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ................................................................ 44

*Arbrook, Inc. v. Am. Hosp. Supply Corp.*,
   645 F.2d 273 (5th Cir. 1981) .................................................................... 44

*Atlantic Works v. Brady*, 107 U.S. 192 (1883) ........................................ 21

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
   796 F.2d 443 (Fed. Cir. 1986) ................................................................ 20

*Bey v. Kollonitsch*, 806 F.2d 1024 (Fed. Cir. 1986) ................................ 38

*Chen v. Bouchard*, 347 F.3d 1299 (Fed. Cir. 2003) ................................ 21

*Christie v. Seybold*, 55 F. 69 (6th Cir. 1893) ........................................... 37

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) .................................. 19

*Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735 (D.C. Cir. 1995) .......... 20

*Dawson v. Dawson*, 710 F.3d 1347 (Fed. Cir. 2013) ............................... 22

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ................................................ 19

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
   800 F.3d 1375 (Fed. Cir. 2015) ........................................................ 19, 21

*Elec. Consumers Res. Council v. FERC*,
   407 F.3d 1232 (D.C. Cir. 2005) .............................................................. 45

*Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011) .......... 59

*Golden Bridge Tech. v. Nokia, Inc.*, 527 F.3d 1318 (Fed. Cir. 2008) ...... 39

*Gould v. Schawlow*, 363 F.2d 908 (CCPA 1966) ..................................... 37

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014) ............................................................ 48

*Idle Free Sys., Inc. v. Bergstrom, Inc.*, IPR2012-00027,
   2013 WL 5947697 (P.T.A.B. June 11, 2013) ........................................ 51

*In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268 (Fed. Cir. 2015)..... 46, 52

*Independence Park Apartments v. United States*,
   449 F.3d 1235 (Fed. Cir. 2006) ............................................................ 20

*Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363 (Fed. Cir. 2008) ....... 39

*Johnson & Johnston Assocs. v. R.E. Serv. Co.*,
   285 F.3d 1046 (Fed. Cir. 2002) (en banc) ............................................ 48

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
   780 F.3d 1376 (Fed. Cir. 2015) ............................................................ 40

*Laitram Corp. v. NEC Corp.*, 115 F.3d 947 (Fed. Cir. 1997) ........... 20, 59

*Maggard v. Apfel*, 167 F.3d 376 (7th Cir. 1999) .................................... 45

*Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572 (Fed. Cir. 1996) ...... 20, 22, 37

*MasterImage 3D, Inc. v. RealD Inc.*,
   No. IPR2015-00040 (P.T.A.B. July 15, 2015) (Paper 42) .................... 51

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 (Fed. Cir. 2003) ............................................................ 53

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
   800 F.3d 1366 (Fed. Cir. 2015) ............................................................ 53

*Medtronic v. Advanced Cardiovascular Systems, Inc.*,
   248 F.3d 1303 (Fed. Cir. 2001) ............................................................ 59

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
   194 F.3d 1250 (Fed. Cir. 1999) ............................................................ 55

*Microsoft Corp. v. Proxyconn, Inc.*,
   789 F.3d 1292 (Fed. Cir. 2015) ........................................................50-52

*Odetics, Inc. v Storage Tech. Corp.*, 185 F.3d 1259 (Fed. Cir. 1999) ...... 60

*On-Line Careline, Inc. v. Am. Online, Inc.*,
    229 F.3d 1080 (Fed. Cir. 2000) ........................................................ 19, 26

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .............................................. 48

*Price v. Symsek*, 988 F.2d 1187 (Fed. Cir. 1993) .................................... 20

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*,
    237 F.3d 1359 (Fed. Cir. 2001) ............................................................ 20

*Sanofi-Aventis v. Pfizer Inc.*, 733 F.3d 1364 (Fed. Cir. 2013) ........... 22, 26

*Slip Track Sys., Inc. v. Metal-Lite, Inc.*,
    304 F.3d 1256 (Fed. Cir. 2002) ......................................................... 20-22

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ............................................................ 35

*Suffolk Techs., LLC v. AOL, Inc.*, 752 F.3d 1358 (Fed. Cir. 2014) ......... 26

*T.H. Symington Co. v. Nat'l Malleable Castings Co.*,
    250 U.S. 383 (1919) ............................................................................ 21

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ..................................................................... 45, 49

*Thorner v. Sony Comp. Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ............................................................ 47

*Torrent Pharms., Ltd. v. Mylan Pharms Inc.*, IPR2014-00784,
    2015 WL 5719630, (P.T.A.B. Sept. 24, 2015) ...................................... 51

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
    374 F.3d 1151 (Fed. Cir. 2004) ............................................................ 20

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ........................ 19

*Upsher-Smith Labs., Inc. v. Pamlab, LLC*,
    412 F.3d 1319 (Fed. Cir. 2005) ............................................................ 44

*Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*,
520 U.S. 17 (1997) ........................................................ 60, 61

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) (en banc) ............................ 53

*Wimbush v. Wyeth*, 619 F.3d 632 (6th Cir. 2010) ...................... 35

*Yuni v. MSPB*, 784 F.2d 381 (Fed. Cir. 1986) ........................ 26

## STATUTES

35 U.S.C. § 100(i) ...................................................... 19

35 U.S.C. § 102 ......................................................... 19

35 U.S.C. § 102(e) ...................................................... 19

35 U.S.C. § 112 ......................................................... 55

35 U.S.C. § 112(b) ...................................................... 47

35 U.S.C. § 112(f) ................................................... 16, 53-56

35 U.S.C. § 282(a) ...................................................... 47

35 U.S.C. § 316(d) ................................................... 50, 52

35 U.S.C. § 316(d)(3) ................................................... 16

## REGULATIONS

37 C.F.R. § 42.100(b) ................................................... 46

37 C.F.R. § 42.121(a)(2) ............................................. 16, 52

37 C.F.R. § 42.20(a) .................................................... 51

37 C.F.R. § 42.20(c) .................................................... 51

## STATEMENT OF RELATED CASES

No appeal has previously been taken from the proceeding below.

Appeal Nos. 2015-1874 and 2016-1031 are related to this appeal. Those two appeals—and this appeal—arise out of three petitions for *inter partes* review, all filed by Medtronic and all challenging Norred's U.S. Patent No. 6,482,228. The three resulting *inter partes* review proceedings were briefed separately, argued at a common hearing, and resolved by the same three-member panel of the Patent Trial and Appeal Board. As shown below, the appeals involve overlapping claims of the same patent, but different prior art. Claims 16 and 19-24 have been found unpatentable on multiple grounds.

| Appeal | PTAB Docket | Result | Final Decision | Notice of Appeal Filed |
|--------|-------------|--------|----------------|------------------------|
| 2015-1731 | IPR2014-00110 | Claims 16-19 unpatentable as anticipated by DiMatteo; claims 16-18 not shown to be anticipated by Wolfe; motion to amend claim 16 denied. | Apr. 23, 2015 | May 1, 2015 |
| 2015-1874 | IPR2014-00111 | Claims 20-24 unpatentable as anticipated by Schreck; claims 22-23 also obvious over Schreck and Shu; motion to amend claim 20 denied. | Apr. 23, 2015 | Jun. 19, 2015 |
| 2016-1031 | IPR2014-00395 | Claims 16 and 19-24 unpatentable as anticipated by Leonhardt and as anticipated by Bailey; motion to amend claims 16 and 20 denied. | Jun. 25, 2015 | Aug. 26, 2015 |

On September 14, 2015, this Court ordered Appeal Nos. 2015-1874 and 2016-1031 consolidated and ordered that both appeals will be companion cases to this appeal and assigned to the same merits panel.

Also related to these appeals is *Norred v. Medtronic, Inc.*, No. 2:13-CV-2061 (D. Kan.). That federal district court case is currently stayed pending resolution of appeal nos. 2015-1731 and 2015-1874. *See* Joint Status Report, ECF #62, D. Kan. No. 2:13-CV-2061 (filed May 7, 2015); Order, ECF #63, D. Kan. Case No. 2:13-CV-2061 (filed May 12, 2015).

## PRELIMINARY STATEMENT

The Board's finding of anticipation, and its denial of Norred's motion to amend, both apply basic legal principles to the evidence and arguments in a straightforward and unremarkable manner.  Norred disagrees with the Board's reading of prior art and weighing of evidence, but fails to demonstrate any basis for reversal.

The Board's factual finding that DiMatteo is prior art applies the longstanding principle that, where an inventor seeks to show that he conceived of his invention before the application's filing date, the inventor must produce evidence showing conception of *every* feature or limitation of the claim.  Norred sought to swear behind DiMatteo based on a sketch. The Board examined the sketch and permissibly found that it did not show conception of all limitations of claims 16-19.  Substantial evidence supports that finding—including the sketch itself and testimony from Medtronic's expert.

Likewise, the Board found that DiMatteo anticipates claims 16-19 for two independent reasons:  It made a factual finding that DiMatteo discloses "pliable" ring members, and it concluded that the "ring member" in claims 16-19 is not limited to "pliable" ring members, in any event.  The

Board's factual finding is supported by substantial evidence including DiMatteo, Medtronic's expert testimony, and a Norred's expert's admissions.  The Board's claim construction is a straightforward application of the principle that limitations from the specification should generally not be read into claims—especially not in *inter partes* review where claims receive their broadest reasonable interpretation.

Finally, the Board's denial of Norred's motion to amend faithfully applies the relevant statutes and this Court's precedents.  All agree that the claimed "means for mounting" is a means-plus-function limitation, and that motions to amend may not expand the scope of the claims in any way.  In this case, the Board correctly found that Norred proposed to broaden claim 16 by removing the "means for mounting" limitation and replacing it with a broader conventional limitation.  The Board was thus required to— and properly did—deny Norred's motion to amend.  That decision should be affirmed.

## STATEMENT OF THE ISSUES

1.    Whether substantial evidence supports the Board's finding that Norred failed to show that he conceived of claims 16-19 before the DiMatteo patent application was filed.

**2.**    Whether the Board's finding that DiMatteo anticipates claims 16-19 should be affirmed for either (or both) of the independent reasons that: (a) substantial evidence supports the Board's finding that DiMatteo discloses a "pliable" ring member, and (b) the Board correctly declined to construe the claimed "ring member" element as requiring a "pliable" ring member.

**3.**    Whether the Board's denial of Norred's motion to amend claim 16 should be affirmed because the Board correctly concluded that Norred's proposed amendment would impermissibly enlarge the scope of the claim.

## STATEMENT OF THE CASE

Norred's appeal challenges two rulings in the Board's final written decision.  A1-23.  The Board ruled that claims 16-19 of U.S. Patent No. 6,482,228 ("the '228 patent") are anticipated by U.S. Patent No. 6,440,164 ("DiMatteo").  And the Board denied Norred's motion to amend claim 16.

### A.    Aortic Valves

The aorta is the largest artery in the human body and connects to lower-left chamber of the heart (the left ventricle).  A valve in the aorta opens and closes in response to the heart relaxing and contracting.  A1469 (Hill Decl.).  As illustrated below, opening and closing is done by three flaps of tissue, or "leaflets."  When the heart contracts, the pressure

change in the heart and aorta causes the leaflets to separate—allowing blood to flow out of the heart and through the aorta. When the heart relaxes, the three leaflets return to the closed position, preventing regurgitation of blood back into the heart. The leaflets are passive: they open and close purely in response to pressures in the aorta and left ventricle. *Id.*



**A1484**

When a valve does not open or close completely or properly, a replacement valve may be necessary. Several replacement heart valves had been invented by the late 1960s. A patent filed in 1967, and of record

below, described and claimed a rotating prosthetic heart valve. A605. That patent noted that prior art at the time included a replacement valve intended to "simulate the action of the natural valve by a physical approximation of the natural valve cusps," and a "well-known ball valve and cooperating seat combination." A605(1:44-57).

## B.    The '228 Patent

The application for the '228 patent was filed November 14, 2000. A464. The patent is titled "Percutaneous Aortic Valve Replacement," and relates to a replacement aortic heart valve that is placed into the aorta with a catheter and held in place with a stent system. A472(1:6-9).

Figures 1-5 show how a valve may be installed. Figure 3 shows part of an implantation process, and figure 4 (shown as annotated in the petition) shows a valve and stent system placed in the aorta.



**A466**                    **A42** (*A466, annotated*)

The specification describes four embodiments. A472(2:10-23). Figures 6-9 show an "umbrella" valve. A468; A473(4:5-52). Figures 10-13 and 14-17 show two cone-shaped valves. A469-70; A473(4:53)-A474(5:32); A474(5:33-62). And Figures 18-19 show a "cadaver/porcine" valve. A471; A474(5:63-6:8).

In the umbrella embodiment, the middle of a membrane is fixed, and the spokes of the umbrella open and close the valve by folding and unfolding the membrane. When the "umbrella" is unfolded, the membrane spreads across the aorta, and the valve is closed. When the umbrella is folded, it sits in the center of the aorta parallel to the direction of blood flow, and blood flows around the folded umbrella. A468 (figures); A472(2:24-27) (description of drawings); A473(4:5-52) (description of embodiment).


**A468** (*valve open, umbrella folded*)


**A468** (*valve closed, umbrella unfolded*)

Figures 3 and 4 show the same opening and closing umbrella valve placed in the aorta. A466. As the written description explains, and those figures illustrate, the umbrella is held in place by connecting the umbrella handle (56, "connecting rod") to a stent (58, "stent struts"). A473(4:7-9); A468 (figures 6-9); A466 (figure 4).

In the two cone-shaped embodiments, the periphery of a membrane is secured, and mechanical "fingers" or "arms" open and close the valve by opening and closing an aperture at the center of the membrane. A473(4:53)-474(5:64). In the first cone-shaped embodiment, the base of the cone (70) at the periphery of the membrane sits against the wall of the aorta. A473(4:53)-474(5:32). Figures 10-13 show a cone-shaped aortic valve, closed in figures 10 and 11, and open in figures 12 and 13:



**A469** (*valve closed*)          **A470** (*valve open*)

The written description states that the valve consists of fingers (68) interconnected by a fabric membrane (75), a ring-shaped base (70) and a

ring (72) secured to the base. A473(4:53-64). The valve is anchored in place with connecting rods (80) connected to stents. A474(5:21-23). *See also* A4 (final written decision). A second cone-shaped embodiment, depicted in figures 14-17, operates similarly, and is sometimes referred to in the record as the "trihedral" embodiment. *See, e.g.*, A42; A390(20-23).



**A470** (*valve closed*)               **A471** (*valve open*)

The "cadaver/porcine" embodiment takes a valve from an animal or human and attaches it to a stent system for implantation. A valve (100) is "retained in a base ring" (102), and anchored with "connecting rods" (104), "which are connected to the ascending aortic stents." A474(6:1-6).



**A471** (*side view*)               **A471** (*plan view*)

*See* A472(2:48-51) (description of drawings); A474(5:63-6:8) (description of embodiment).

The '228 patent has four independent claims: nos. 1, 12, 16, and 20. Claims 16-19 are at issue in this appeal, and are reproduced below and on the inside-front cover of this brief. Claims 16-19 generally correspond to the cone-shaped embodiments: each recites a "ring member having a circumference adapted to seat about an aortic wall," blood flow "through" a membrane rather than around it, and a "membrane" that has a "first open end … and a second open end displaced therefrom."

Claim 16 recites an aortic valve comprising **(1)** a "ring member," **(2)** a "membrane," and **(3)** a "means for mounting" the membrane to the ring member:

> **16.** An aortic valve for regulating a blood flow through an aortic channel surrounded by an aortic wall upon placement therein, said valve comprising:
>
> > a ring member having a circumference adapted to seat about an aortic wall surrounding an aortic channel, said ring including an aperture for blood flow therethrough;
> >
> > a membrane having first and second spaced-apart open ends, said membrane made of a material resistant to a fluid flow therethrough; and
> >
> > means for mounting said first open end of said membrane about said ring aperture with said second open end displaced therefrom, said means moving said membrane second end between a first open position to allow a blood

flow therethrough and a second closed position to preclude a blood flow therethrough.

A475.

Claims 17-19 depend from claim 16:

**17**. The aortic valve as claimed in claim **16** wherein said mounting means comprises at least one arm having a first end hingedly secured to said ring member and a free end spaced therefrom, said first end of said at least one arm secured to said first end of said membrane, said free end of said at least one arm secured to said second end of said membrane, said at least one arm responsive to a blood flow within the channel for movement with said membrane between said first open and second closed positions.

**18.** The aortic valve as claimed in claim **17** wherein said at least one arm extends generally along a path of said blood flow at said first open position, and generally traverses a blood flow path when at said second closed position.

**19.** The aortic valve as claimed in claim **16** further comprising means for maintaining said ring member in said seat about the aortic wall.

*Id.*

## C.   *Inter Partes* **Review Proceedings**

Medtronic's petition challenged claims 16-19.  A78-114 (petition);

A99-114 (claim charts); A1461-82 (declaration of Alexander J. Hill, Ph.D.).

The Board instituted *inter partes* review on two of the four grounds in

Medtronic's petition:   **(1)** that U.S. Patent No. 6,440,164 (DiMatteo)

anticipated claims 16-19, and **(2)** that U.S. Patent No. 4,030,142 (Wolfe)

anticipated claims 16-18. A186. The Board's final written decision ruled that the DiMatteo patent anticipated claims 16-19, but the Wolfe patent had not been shown to anticipate claims 16-18. A19. The Board's final written decision also denied Norred's motion to amend claim 16. A19-22.

### 1. Anticipation by DiMatteo

The DiMatteo patent was filed October 21, 1999, and is titled "Implantable Prosthetic Valve." DiMatteo was not cited during prosecution of the '228 patent. A92; A464. DiMatteo discloses an implantable prosthetic heart valve with a "tubular" "scaffold" portion, and a "leaf valve" portion, A11-12 (citing A585(abstract); A595(6:30-31)). Hinged leaflets control blood flow through the valve. A593(1:4-6); A594(3:18-27). Figures 1-4 show top and side views of an embodiment with valve leaflets open and closed.



FIG 1 (side view, closed)    FIG 2 (top view, closed)    FIG 3 (side view, open)    FIG 4 (top view, open)

**A586**

Figure 16 shows a different embodiment with the leaflets connected by

11

webbing. And Figure 17 shows that the valve can be held in place by connecting it to a stent ("second scaffold 150").



A587                         A589

Medtronic's petition, claim charts, and declaration explained how DiMatteo disclosed all elements of claims 16-19. A99-103; A92-93; A1476-78. For example, DiMatteo discloses the claimed "ring member," "membrane," and "means for mounting" in claim 16 as a "tubular body portion," "valve leaf covers" and "webbing," and "arm[s]" connected at hinge lines to the "tubular body portion" A99-101. DiMatteo also discloses the claimed "means for maintaining" in claim 19 as a scaffold and connecting wire. A103.

At institution, the Board found that Medtronic had shown a reasonable likelihood that DiMatteo anticipated claims 16-19. A181-83. After trial, the Board reviewed the DiMatteo patent again and concluded that Medtronic met its burden of proof to show anticipation. A11-16.

12

Before the Board, Norred made two arguments against anticipation by DiMatteo, both of which Norred renews on appeal.

*First*, Norred argued that DiMatteo is not prior art because, despite the November 2000 filing date on Norred's patent application, Norred actually conceived of claims 16-19 in December 1998. A8-11. Norred argued that a December 1998 sketch (A1598, shown below) showed that he "conceived of his invention no later than December 21, 1998," A215; *see* A214-22, and that several documents showed that he was diligent in reducing to practice "beginning just before October 21, 1999 (when the DiMatteo patent application was filed) and ending on November 20, 2000 (when [Norred's] own patent application was filed)." A223; *see* A222-38.



Medtronic responded that Norred could not establish either a
conception date before October 21, 1999, *or* that he was "diligent" in
reducing to practice under the relevant legal standards.  A293-301.

In its final written decision, the Board found that Norred failed to
show that he "conceived of the invention of the challenged claims prior to
the October 21, 1999 filing date of DiMatteo," A11, and thus did not need
to reach the question of diligence in reducing to practice.  The Board was
"not persuaded that the drawing provides sufficient detail to establish
possession of an embodiment of the invention having the particular
limitations set forth in the claims."  A10.  Rather, the Board reasoned, the
drawing lacked several claim elements such as a "ring member having a
circumference adapted to seat about an aortic wall surrounding an aortic
channel" and "at least one arm having a first end hingedly secured to said
ring member and a free end spaced therefrom."  A11.

*Second*, Norred argued that DiMatteo does not disclose the claimed
"ring member" because (a) a proper construction of that term requires that
the "ring member" be made of "pliable" material, A13, A240-42, and (b) the
tubular body portion disclosed in DiMatteo is not pliable.  A13, A242-44.
The Board rejected that argument at both steps.  In its institution

14

decision, the Board declined "to require the ring to be made of any particular material," or "to require the ring to necessarily form an immediate seal with the aortic wall as the evidence of record does not support such a special meaning." A179. In its final decision, the Board concluded that DiMatteo disclosed a "pliable" ring member, regardless of whether the claims required pliability. A13-14. DiMatteo disclosed that the tubular body portion should preferably be made with "superelastic" materials, A14 (quoting A596(8:64-67)), which Norred's expert admitted were "pliable." *Id.* (citing A897:8-10).

### 2. Norred's Motion to Amend

After the Board instituted *inter partes* review proceedings and after Norred filed its Patent Owner response, Norred filed a motion under 37 C.F.R. § 42.121 to amend claim 16 as follows:

> 25. (Proposed substitute for claim 16) An aortic valve for regulating a blood flow through an aortic channel surrounded by an aortic wall upon <u>percutaneous</u> placement therein, said valve comprising:
>
> > a ring member having a <u>pliable</u> circumference adapted to seat about an aortic wall surrounding an aortic channel <u>and seal against a root of a native aortic valve upon percutaneous placement</u>, said ring member including an aperture for blood flow therethrough;
> >
> > <u>an expandable stent system extending into the ascending aorta upon said percutaneous placement therein and</u>

15

> connected to said ring member; and
>
> a membrane having first and second spaced-apart open ends, said membrane made of a material resistant to a fluid flow therethrough;
>
> ~~means for mounting~~ said first open end of said membrane <u>hingedly secured</u> about said ~~ring~~ aperture <u>of said ring member</u> with said second open end displaced therefrom, ~~said means moving~~ said ~~membrane~~ second <u>open</u> end <u>movable</u> between a first open position to allow a blood flow therethrough and a second closed position to preclude blood flow therethrough;
>
> <u>said aortic valve having a collapsed configuration for delivery inside a catheter, and an expanded configuration when deployed from said catheter and percutaneously placed in the aortic channel</u>.

A260-61.

Medtronic opposed, arguing that Norred's motion to amend should be denied for several procedural and substantive reasons, A306-26, including that the patent's written description did not support the new proposed claim, A318-19. The Board did not need to reach all of Medtronic's arguments because it agreed with Medtronic's principal contention that the proposed amendment would impermissibly broaden claim 16 in some respects, in violation of 35 U.S.C. § 316(d)(3) and 37 C.F.R. § 42.121(a)(2)(ii). A19-22. The amendment removed the "means for mounting" limitation, which was limited under 35 U.S.C. § 112(f) to certain disclosed "fingers or arms" secured with hinges, and replaced it

16

with a different limitation that did not require fingers or arms.  A19-22.

The Board thus denied Norred's motion to amend claim 16, and ordered claims 16-19 cancelled as unpatentable in light of DiMatteo.  A22. Norred now appeals.

## SUMMARY OF THE ARGUMENT

The Board's rulings are supported by substantial evidence and should be affirmed.

1.    The Board correctly found that DiMatteo is prior art to Norred's '228 patent.  DiMatteo predates Norred's filing date—and thus his presumptive date of invention—by more than a year.  Norred submitted a notarized sketch to attempt to show an earlier conception date, but the Board's reading of the sketch is supported by substantial evidence.  On its face, the sketch shows that a valve may be anchored to a stent, but fails to disclose the details of any particular valve as claimed in claims 16-19.  Norred's attorney arguments to the contrary simply offer an unsupported, competing view of the sketch without demonstrating reversible error.

2.    The Board correctly found that DiMatteo discloses a pliable "ring member" and that the claims do not require a "pliable" ring member

in any event. Norred contends as a factual matter that the valves disclosed in DiMatteo should be made of rigid material, but the Board was entitled to credit contrary evidence, including DiMatteo's explicit disclosure that the ring member should be made of "superelastic" material, which is undisputedly pliable, and the testimony of Medtronic's expert explaining why the valves disclosed in DiMatteo need not be made of rigid material. Regardless, the claim language, either on its face or in context, does not limit the "ring member" to any particular material. Reading such a limitation into the claims would be contrary to precedent, and would certainly not be the broadest reasonable interpretation of the claim.

3.    The Board correctly denied Norred's motion to amend claim 16. Norred's motion would plainly have broadened claim 16 by substituting a means-plus-function limitation ("means for mounting," properly construed as the disclosed "fingers" or "arms" in the specification) for a broader, conventional limitation that required no "fingers," "arms," or any other structure.

## STANDARD OF REVIEW

The Court reviews the Board's legal determinations *de novo* and factual findings for substantial evidence. *Dynamic Drinkware, LLC v.*

*Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing cases). "Substantial evidence" is a deferential standard of review that the Supreme Court has analogized to a court's review of a jury's fact findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Dickinson v. Zurko*, 527 U.S. 150, 162 (1999); *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000).

## ARGUMENT

## I. The Board Correctly Ruled that DiMatteo Anticipates Claims 16-19.

### A. The Board Correctly Found that DiMatteo is Prior Art.

The DiMatteo patent is prior art to Norred's '228 patent if its filing date—October 21, 1999—precedes "the invention by" Norred. 35 U.S.C. § 102(e) (2000).[1] Norred's date of "invention" is "presumed to be" the November 14, 2000 filing date of his patent application, "until an earlier date is proved." *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,

---

[1] Following the America Invents Act, the United States patent system now bases priority on the "effective filing date" of a patent application, not any earlier alleged invention date. *See* 35 U.S.C. § 100(i) (2012); *id.* § 102 (2012). Norred's application was filed before America Invents Act, so the preexisting version of § 102 applies. *See, e.g.*, *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 n.1 (Fed. Cir. 2014).

796 F.2d 443, 449 (Fed. Cir. 1986).  A patentee attempting to show an

invention date earlier than the patent's filing date "must show either an

earlier reduction to practice, or an earlier conception followed by a diligent

reduction to practice."  *Purdue Pharma L.P. v. Boehringer Ingelheim*

*GmbH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001) (citing *Price v. Symsek*, 988

F.2d 1187, 1190 (Fed. Cir. 1993)); *see also Mahurkar v. C.R. Bard, Inc.*, 79

F.3d 1572, 1578 (Fed. Cir. 1996).[2]

"Conception is the formulation of a definite and permanent idea of

the *complete and operative* invention as it his hereafter to be applied in

practice."  *Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1262-63

(Fed. Cir. 2002) (emphasis added).  "Conception must include *every feature*

---

[2] The Board instituted *inter partes* review on two grounds.  One was that
U.S. Patent No. 4,030,142 (Wolfe) anticipated claims 16-18.  A186.  The
Wolfe patent issued in 1977, A622, and is unaffected by Norred's argument
that Norred conceived of claim 16 in 1998.  The Board ruled that Wolfe did
not anticipate claims 16-18, A16-19, but ordered those claims cancelled on
other grounds (anticipation by DiMatteo).  Medtronic thus had no right
and no reason to cross-appeal the Board's decision with respect to Wolfe.
*See TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157
(Fed. Cir. 2004) (where all claims at issue are held invalid, "there is no
basis for a cross-appeal as to … additional claims for invalidity.").  In the
event of a remand, Medtronic would be entitled to pursue its arguments
that Wolfe invalidates claims 16-18.  *See Independence Park Apartments v.
United States*, 449 F.3d 1235, 1240-41 (Fed. Cir. 2006); *Laitram Corp. v.
NEC Corp.*, 115 F.3d 947, 953-54 (Fed. Cir. 1997); *Crocker v. Piedmont
Aviation, Inc.*, 49 F.3d 735, 741 (D.C. Cir. 1995).

or limitation of the claimed invention." *Id.* at 1263 (emphasis added).

Although the challenger bears the ultimate burden of proof of invalidity, the patentee bears a burden of production to demonstrate an earlier conception date. *Allergan*, 754 F.3d at 967-68 (reversing judgment that a reference was not prior art); *Dynamic Drinkware*, 800 F.3d at 1379-80. For more than 100 years, the Supreme Court has recognized the need for caution when considering a self-interested inventor's testimony regarding his own conception date. *Atlantic Works v. Brady*, 107 U.S. 192, 203 (1883) ("Interested as he is in the result of the suit, his own testimony cannot be allowed to prevail against a course of conduct so utterly at variance with it."); *T.H. Symington Co. v. Nat'l Malleable Castings Co.*, 250 U.S. 383, 386 (1919) ("[O]ral testimony tending to show prior invention as against existing letters patent is, in the absence of models, drawings, or kindred evidence, open to grave suspicion, particularly if the testimony be taken after the lapse of years from the time of the alleged invention."); *Chen v. Bouchard*, 347 F.3d 1299, 1309-10 (Fed. Cir. 2003) (noting "concern that a party claiming inventorship might be tempted to describe his actions in an unjustifiably self-serving manner in order to obtain a patent or to maintain an existing patent"). Thus, "[i]nventor

testimony alone is insufficient to prove conception; some form of corroboration must be shown." *Slip Track Sys.*, 304 F.3d at 1263; *see also Mahurkar*, 79 F.3d at 1577 (similar).

"The issue of conception turns in large part on facts, and [the Court] review[s] the Board's … factual findings … for substantial evidence." *Sanofi-Aventis v. Pfizer Inc.*, 733 F.3d 1364, 1366 (Fed. Cir. 2013) (quoting *Dawson v. Dawson*, 710 F.3d 1347, 1352 n.1 (Fed. Cir. 2013)). Here, substantial evidence supports the Board's finding that Norred did not conceive of claims 16-19 before the filing date of DiMatteo. A8-A11. The sketch at the core of Norred's argument is shown below (A1598; reproduced in final written decision at A10):



At most, the sketch depicts the idea that a prosthetic valve—of some type—can be implanted in the aorta and anchored with a stent.  The Board correctly noted that the drawing does not identify any details about any particular prosthetic valve.  A10-11.  To the contrary, the sketch expressly states that it "allows for multiple valvular designs," and it refers generally to a "sutured bioprosthetic valve," without describing or disclosing any details about any particular valve.  A1598.

Claim 16, by contrast, is explicitly directed to "[a]n aortic valve," comprising several specific elements, including **(1)** a "ring member", **(2)** a "membrane" with two "ends" and **(3)** a "means for mounting" that both "mount[s]" the "first" end of the membrane "about" a "ring aperture," and "mov[es]" the "second" end of the "membrane … between a first open position … and a second closed position."   A475.   At most the sketch identifies only two elements of a device to be inserted into the aorta without the specifics required by claim 16:  (a) a "nitinol self-expanding stent" that, according to the sketch, "expands to the shape of the aorta & sinus," and (b) a "sutured bioprosthetic valve."   A1598; A10-11.   Other notations in the sketch either identify preexisting anatomy ("aorta," "sinus of Valsalva"), or general design considerations ("If more surface area needed").   A1598.   The Board thus correctly concluded that Norred's sketch did not indicate conception of all elements of claims 16-19:

> The detail in the sketch is insufficient to describe each element of the claims such as, for example, a "ring member having a circumference adapted to seat about an aortic wall surrounding an aortic channel" (claim 16) or "at least one arm having a first end hingedly secured to said ring member and a free end spaced therefrom" (claim 17).

A11.

The Board further concluded that nothing else in Norred's

24

submissions showed a conception date predating DiMatteo's filing date:

> Upon reviewing the record as a whole, however, we cannot conclude that the record establishes, by corroborated evidence, that Dr. Norred conceived of the invention of the challenged claims prior to the October 21, 1999 filing date of DiMatteo.

*Id.*

On appeal, Norred argues that the Board misinterpreted the sketch. Opening Br. 37-39.[3]  Norred does not cite any evidence (other than the sketch itself), or expert testimony about the sketch, much less evidence that would demonstrate clear error in the Board's factual finding.  Instead, Norred relies on a series of versions of the 1998 sketch that he and his attorneys annotated for this litigation.  In 2014, for the proceeding below Norred and his attorneys took the 1998 sketch, darkened and colored some portions, and added arrows and text boxes to state their view that certain elements of claim 16 are somehow present in the sketch.  Opening Br. 38-39.  Attorney argument is generally insufficient to overturn a judgment on substantial evidence review.  *Suffolk Techs., LLC v. AOL, Inc.*, 752 F.3d

---

[3] Norred explicitly limits his arguments on appeal to claim 16, Opening Br. 40 ("While it is true that [the sketch] does not show fingers or arms, claim 16 does not require fingers or arms.  That limitation is in claim 17."), and does not attempt to show an earlier conception date for claims 17-19.  Even if Norred's arguments were accepted, the DiMatteo patent would remain prior art to claims 17-19.  Regardless, Norred's arguments are meritless.

1358, 1367 (Fed. Cir. 2014) ("Without expert testimony, however, Suffolk's position is mere attorney argument. And here, those attorney arguments are insufficient to undermine the credible [contrary] testimony."); *Yuni v. MSPB*, 784 F.2d 381, 387 (Fed. Cir. 1986) ("Attorney argument does not of itself constitute substantial evidence."). So too here. "Conception turns in large part on facts," reviewed "for substantial evidence" on appeal. *Sanofi-Aventis*, 733 F.3d at 1366. Norred fails to demonstrate that "a reasonable person" could not have viewed the sketch the way the Board did. *On-Line Careline*, 229 F.3d at 1085. Indeed, many of Norred's 2014 annotations are inconsistent with the 1998 sketch, self-contradictory, or attempt to read in numerous details 16 years after the fact that are simply not present in the original sketch.

As an initial matter, Norred's 2014 annotations effectively treat the claimed "first" and "second" "ends" of the claimed "membrane" in an inconsistent manner. The two claimed "ends" have distinct features and functions, but Norred mixes and matches aspects of both ends in an attempt to shoehorn claim 16 into the sketch. Claim 16 recites two "spaced-apart open ends," like a sleeve. The "second" end of the membrane is "displaced" from the first end, and the valve opens and closes when the

*second* end is moved between an "open position" and a "closed position":

> a membrane having first and second spaced-apart open ends, said membrane made of a material resistant to a fluid flow therethrough; and

> means for mounting said first open end of said membrane about said ring aperture with said second open end displaced therefrom, said means moving said membrane second end between a first open position to allow a blood flow therethrough and a second closed position to preclude a blood flow therethrough.

A475(8:4-12).

Norred's 2014 notations include an arrow pointing to a blank area of the natural aorta as purportedly disclosing the claimed "second space[d]-apart open end(s)" of the claimed membrane, which is inconsistent with the 1998 sketch.



Opening Br. 38 (highlighting added).

Nothing in the original sketch indicates that the claimed "second spaced-apart open end" of the claimed "membrane" is near the top of the drawing. A1598.  Nor does anything in the sketch indicate how the means for mounting moves the "second" end between open and closed positions, as the claim requires.  A475(8:8-12).  Indeed, reference to claim 16's "said means moving said membrane second end" is nowhere to be found in the original sketch or even in the 2014 annotated versions.  Tellingly, the

notation in the 1998 sketch that is nearest to the blank area of the sketch that Norred now argues contains the "second" "end" of the membrane states simply "If more surface area needed"—which presumably refers to using a longer stent, but is ambiguous at best. The Board was not required to credit Norred's unsupported contention that the top of the drawing depicts "second space-apart open end(s)" of the claimed membrane.

Further, Norred's 2014 notations on pages 38 and 39 regarding the claimed "ends" contradict each other in a way that cannot be squared with the claim language. As noted above, Claim 16 recites that the "second" end of the membrane is "displaced" from the first end, and that the valve opens and closes when the *second* end moves between an "open position" and a "closed position." A475(8:8-12). As shown below, however, while Norred's 2014 notations place the "second" end in a blank area near the *to*p of the sketch (Opening Br. 38), they place the "first open position" and "second closed position" at the *bottom*, with what Norred's 2014 notations say is the "*first*" end (from which the second end is "displaced"), not the second (Opening Br. 39).



Opening Br. 38 (highlighting added)



Opening Br. 39 (highlighting added)

Norred cannot have it both ways: Norred cannot assert that the required "second end" is disclosed in one part of the sketch, but that the "means moving said membrane second end between a first open position to allow a blood flow therethrough and a second closed position to preclude a blood flow therethrough" is disclosed in a different part of the sketch, which Norred simultaneously asserts is the "first end." Simply put, the sketch does not disclose all of the claimed elements and the board's factual finding to that effect is not clearly erroneous.

Beyond Norred's unsupported treatment of the claimed "ends," Norred argues that the center of a circle at the bottom of the sketch discloses the claimed "means for mounting."



Opening Br. 39 (highlighting added). It is undisputed that the "means for mounting" is a means-plus-function limitation, Opening Br. 23-25, and that that element covers at least the "fingers" or "arms" referred to in the written description's discussion of the "conical" embodiments. *Id.* at 29. The 1998 sketch, however, self-evidently discloses no structure at all, A1598, let alone "fingers" or "arms," and therefore cannot demonstrate possession of the "means for mounting," element of the claims. Norred argues that a person of skill in the art would have discerned the "means for mounting" from the the sketch's generic recital of "one example sutured bioprosthetic valve." Opening Br. 40. That argument is unsupported and the Board was not required to adopt it. Norred cites a paragraph of his expert's declaration, A2179-80, but that declaration expresses no opinion *at all* regarding Norred's 1998 sketch. The cited portion simply describes the operation of a natural heart valve, A2179-80 (section titled "The Native Aortic Valve"), and cannot support Norred's attorney argument regarding the meaning to one of skill in the art of "one example sutured *bioprosthetic* valve."

The remainder of Norred's annotations place great weight on a faint circle with three lines—which Norred and his attorneys darkened and

colored in for this litigation in 2014.  Opening Br. 38-39.  Norred argues that the circle and lines disclose nine specific features in claim 16:  (1) "a ring member," (2) "a circumference adapted to seat about an aortic wall surrounding an aortic channel," (3) "an aperture for blood flow therethrough," (4) a "first open end," (5) "a membrane," (6) "made of a material resistant to fluid flow therethrough," (7) "means for mounting…," (8) "a first open position to allow blood flow therethrough," and (9) "a second closed position to preclude a blood flow therethrough.":





Opening Br. 38-39.

Again, Norred's arguments are inconsistent with the original 1998 sketch. In the original sketch, the annotations pointing to the faint circle at the bottom recite an "aortic valve" and "one example sutured bioprosthetic valve," and state that the drawing "allows for *multiple valvular designs*" A1598 (emphasis added):



Those undetailed, explicitly general annotations in the original 1998

sketch are inconsistent with Norred's detailed, more specific annotations in his 2014 PTAB brief where he argues that the sketch actually depicts several specific details of a particular valve. In sum, it is Norred's reading of the sketch, not the Board's, that lacks substantial evidence.

Norred's second argument is that, even if the sketch does not show conception of all limitations of claim 16, other evidence corroborated his testimony of an earlier conception date for claim 16. Opening Br. 40-41. That argument consists of a string-citation to 254 pages of the record and an assertion that the Board erred in failing to credit Norred with an earlier invention date based on that citation. *Id.* As an initial matter, the argument is waived. Statements of disagreement with the factfinder, without developed argument, are waived on appeal. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (citing cases from four circuits); *cf. Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010) ("[I]t was [plaintiff's] job to point to the evidence with specificity and particularity in the relevant brief rather than just dropping a pile of paper on the district judge's desk and expecting him to sort it out."). The Board alerted Norred to a similar deficiency at the initiation stage, yet Norred still provides no explanation. A176 ("Dr. Norred … does not sufficiently

explain the contents of the exhibits.  Dr. Norred also does not sufficiently map each claim limitation to supporting evidence in a manner that would enable us to determine if there had been an actual reduction to practice of the claimed subject matter.").

Even setting aside Norred's failure to explain the cited documents, the Board examined the full record at the final decision stage and was permissibly unpersuaded.  A11 ("Upon reviewing the record as a whole, however, we cannot conclude that the record establishes, by corroborated evidence, that Dr. Norred conceived of the invention of the challenged claims prior to the October 21, 1999 filing date of DiMatteo.").  Most of the documents Norred now cites post-date DiMatteo's filing date, have no date at all, and/or have no clear relevance to any argument regarding conception.  Exhibit 2019 (A1645-51), for example, is handwritten notes of a "Dr. Lombardo," which are dated June 2000 (well after DiMatteo's filing date), and which have no clear relevance to claim 16.  Exhibit 2032 (A1685-1700) purports to be a series of journal article abstracts that Dr. Norred found between April and June 2000 (A2138)—again, well after DiMatteo's filing date and doing nothing to support Norred's assertion that he had conceived of claim 16 in 1998.  Exhibit 2035 (A1705) is an undated

letter from Norred to a "Dr. Flaker" speaking in general terms about "my percutaneous aortic valve." A1705. Even if the Court were to accept Norred's invitation to examine the documents string-cited in his brief, they fail to demonstrate an earlier conception date. The Board thus permissibly concluded that "the record as a whole" failed to support Norred's assertion of an earlier conception date. A11.

Finally, it bears noting that Medtronic raised an additional reason to reject Norred's arguments for an earlier priority date. A296-301. An inventor who conceives of an invention first but reduces to practice second must "connect[] the conception with [the] reduction to practice by reasonable diligence … so that they are substantially one continuous act." *Mahurkar*, 79 F.3d at 1577 (quoting *Christie v. Seybold*, 55 F. 69, 76 (6th Cir. 1893) (Taft, J.)). The inventor's proof of diligence must be specific: "[m]erely stating that there were no weeks or months that he 'did not work on the [invention]' is not enough, absent supporting facts showing specifically what that 'work' consisted of and when it was performed."). *Gould v. Schawlow*, 363 F.2d 908, 918 (CCPA 1966). Where, as here, the inventor relies on the filing of the patent application as the reduction to practice, A223, the preparer of the application must show diligence,

including "the exact days when activity specific to [the] application occurred." *Bey v. Kollonitsch*, 806 F.2d 1024, 1027-28 (Fed. Cir. 1986). Here, as Medtronic explained below, Norred's attempt to show diligence fell well short of those standards. Norred's declaration relied on such vague generalities as "I met with Dr. Hsieh on a regular basis from September 1999 through March 2000 as often as our schedules would allow," A297 (quoting A2136), and his attorney's statement that the attorney worked approximately 80 hours spread over six months on Norred's patent application— without providing any records approaching the level of specificity required to show diligence. A299-300. The Board did not reach the question of diligence because it was properly unpersuaded that Norred showed a conception date predating DiMatteo. A11. If, however, the Court were to find that the Board erred by not crediting Norred's assertions of an earlier conception date, it can affirm because of Norred's deficient proof of diligence or it can remand for the Board to consider Norred's lack of diligence in the first instance.

## B. The Board's Finding that DiMatteo Discloses the Claimed "Ring Member" Should be Affirmed.

Norred disputes the Board's finding that DiMatteo discloses the "ring member" recited in claim 16. Norred argues that the Board erred because,

in Norred's view, the claimed "ring member" must be "pliable" and DiMatteo does not disclose a "pliable" ring member.  Opening Br. 42-47. The Board correctly rejected both arguments.  At the institution stage, the Board rejected Norred's argument at the first step and ruled that a "pliable" limitation should not be read into the claims.  A178-79.  In its final decision, the Board rejected Norred's argument at its second step—even if one assumes that the claims require a "pliable" ring member, the Board found that DiMatteo discloses a "pliable" ring member.  A11-16. Either or both of those reasons is independently sufficient to affirm the Board's finding that DiMatteo discloses the claimed "ring member."[4]

### 1.   DiMatteo Discloses a Pliable "Ring Member."

"What a prior art reference discloses is … a question of fact." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1378 n.6 (Fed. Cir. 2008); *Golden Bridge Tech. v. Nokia, Inc.*, 527 F.3d 1318, 1323 (Fed. Cir. 2008).  Anticipation is also a question of fact, reviewed on appeal for

---

[4] There is no merit to Norred's contentions that the Board "implicitly accepted" his argument that the claimed "ring member" must be pliable. *See* Opening Br. 18, 42, 44. The Board explicitly rejected that argument in its institution decision, A179-80, and never reversed itself.  Any "implicit accept[ance]" in the Board's final written decision was only for the sake of argument, as the Board found that DiMatteo discloses a pliable ring member regardless of whether the claims require it.  A11-16.

substantial evidence.  *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015).

The final written decision analyzes the DiMatteo reference, and explains the substantial evidentiary support for the Board's factual finding that DiMatteo discloses a "pliable" "ring member."  A11-16.  As the Board noted, one embodiment disclosed in DiMatteo is a valve depicted in figure 1 with a tubular portion (12).  A12.



DiMatteo discloses that the tubular portion may have "liners" and a "trellis," A596(7:24-37), and states explicitly that that the trellis may be formed using a variety of materials, *preferably* those with "superelastic properties":

> Trellis **24** may therefore be formed from a variety of materials including stainless steel, titanium, platinum, gold and other bio-compatible metals. ... Shape memory alloys having *superelastic properties* generally made from specific ratios of nickel and titanium, commonly known as nitinol, are among the *preferred trellis materials*.

A596(8:60-67) (quoted in part at A14 (Board opinion)). Norred does not dispute that the "superelastic" materials DiMatteo refers to are pliable, and his brief on appeal does not even mention this portion of DiMatteo's disclosure. Norred's expert Dr. Catchings was shown that precise passage at a deposition (beginning with "Shape memory alloys"), and agreed that "superelastic material is pliable." A14 (citing A897(195:8-10)).[5]

DiMatteo further discloses that the valve is expected to sit on the aortic wall, and facilitates tissue ingrowth for "'assimilating the valve of the present invention into the body of the lumen.'" A14 (Board opinion, citing A593(1:5-6); A599(14:55-56); A594(3:29-33); A594(4:61-64)).

After considering the parties' evidence and arguments, the Board "determine[d] that a preponderance of evidence supports a finding that the superelastic material of DiMatteo is pliable and thus capable of seating about an aortic wall," and was "not persuaded by Patent Owner's attempt to distinguish the ring member element of the claims from the liner 82/trellis 24 combination used in DiMatteo's device on the basis of pliability." A14.

---

[5] Medtronic pointed out Dr. Catchings' admission to the Board. The Board acknowledged the point without explicitly accepting or rejecting it. A14 ("Petitioner contends also that Patent Owner's expert, Dr. Catchings, testified that super elastic material is pliable.")

On appeal, Norred offers no direct response to the Board's analysis, Opening Br. 44-47, but contends that the Board "ignored uncontroverted evidence that the purported ring member disclosed in DiMatteo … is not and cannot be pliable." *Id.* at 44 (emphasis omitted). The "evidence" referred to, however, is nothing more than Norred's own reading of the DiMatteo reference. *Id.* at 44-47. Norred argues, as a factual matter, that if a valve is constructed according to DiMatteo's disclosure and with a pliable ring, the valve will not function optimally because the valve leaflets may misalign. *Id.* at 45-46. The drawing Norred reproduces in his brief ("exhibit 2133", at page 46 of the Opening Brief) is simply an artist's rendering of Dr. Norred's view of the facts. *See* A967-68 (Catchings deposition testimony: drawing was prepared by an artist "given direction by Dr. Norred" of what to draw); *see also* A989-91 (Norred deposition testimony, similar).

DiMatteo's explicit, undisputed disclosure that the ring member should preferably be made of superelastic materials is substantial evidence, sufficient by itself to support the Board's finding of anticipation. Norred's failure to address the Board's analysis is a sufficient basis to

affirm.[6]

Even setting aside Norred's failure to address the Board's analysis, Norred's argument is wrong on its own terms.   Norred's reading of DiMatteo is not "uncontroverted."  Medtronic's expert Dr. Hill directly and specifically addressed Norred's reading of DiMatteo and explained why it was wrong, and why DiMatteo's disclosure includes functioning valves with pliable ring members:

> 59.   Dr. Catchings' deposition testimony further presents various hypothetical drawings (Exhibits 2132-2134) of the DiMatteo valve, and also presents testimony of what "could happen" with various manners of implantation.  None of this testimony or drawings find a basis or foundation in DiMatteo. …  [O]ne of ordinary skill in the art would not design or implant the DiMatteo valve in the manner suggested or hypothesized by Dr. Catchings' testimony.  That is, one of ordinary skill in the art of valve design would ensure that the leaflets of the DiMatteo valve would have sufficient flexibility and/or overlap to ensure proper alignment and orientation to seal and prevent regurgitation.  Also, it must be noted that even perfectly functioning prosthetic aortic valves do not fully prevent regurgitation, nor is this required … It is well known that a prosthetic valve that provides less than complete fluid

---

[6] It bears noting that Norred's arguments ask this Court to hold the DiMatteo patent and Norred's own 1998 sketch to different standards.  On the one hand, Norred argues that a faint circle in his 1998 sketch demonstrates conception of claim 16, including the claimed "ring member having a circumference adapted to seat about an aortic wall," Opening Br. 38, while on the other he argues that DiMatteo's explicit disclosure of a "tubular" component made of "superelastic material" does not.  Both cannot be true, and the Board correctly found that neither is true.

> integrity between adjacent valve leafs will still achieve desired
> performance parameters.

A1477 (Hill expert declaration, filed with Medtronic's petition).[7]

To the extent Norred argues that the valve in DiMatteo must not have worked properly or optimally, those arguments run afoul of the presumption that "both the claimed and unclaimed disclosures in a prior art patent are enabled," *Amgen v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003), and the principle that allegedly inferior or inefficient anticipation is still anticipation. *Upsher-Smith Labs., Inc. v. Pamlab, LLC*, 412 F.3d 1319, 1322-23 (Fed. Cir. 2005); *Arbrook, Inc. v. Am. Hosp. Supply Corp.,* 645 F.2d 273, 277 (5th Cir. 1981).

More fundamentally, Norred's arguments cannot overcome the standard of review. The question whether DiMatteo discloses a pliable ring member is, at best, a factual dispute about which the parties' experts disagreed. A court of appeals reviewing an agency's decision for substantial evidence does not "substitute [its] judgment for that of the

---

[7] Norred asserts that Dr. Hill "acknowledged" that the liner/trellis combination "must remain fixed." Opening Br. 45 (citing A355). The cited document is *Norred's characterization* of Dr. Hill's testimony contained in Norred's motion for observation. A355. As Medtronic's response explained, Norred's characterization is inaccurate. A373. Dr. Hill's testimony does not support Norred's argument on appeal.

[agency] by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999); *see also Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1236 (D.C. Cir. 2005) (on substantial evidence review, "the court defers to the [agency's] resolution of factual disputes between expert witnesses."). The Board was entitled to credit Medtronic's evidence and arguments, and its expert's view of the facts, over Norred's.

## 2. The Claims Do Not Require a "Pliable" Ring Member, In Any Event.

If the Court affirms the Board's finding that DiMatteo discloses a "pliable" ring member, it need not reach the claim construction issue Norred raises on appeal. The Board's ruling that the claims do not require a "pliable" ring member, however, is correct. And, apart from Norred's arguments regarding his conception date, that claim construction is an independently sufficient basis to affirm the judgment that claims 16-19 are unpatentable as anticipated by DiMatteo.

This Court reviews the Board's claim construction according to *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015): "underlying factual determinations concerning extrinsic evidence" are reviewed "for substantial evidence and the ultimate construction of the

claim de novo." *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1279-80 (Fed. Cir. 2015).  Claims of an unexpired patent in *inter partes* review are given their broadest reasonable interpretation in light of the specification.  *Id.* at 1275-78; 37 C.F.R. § 42.100(b).

Claim 16 recites—and dependent claims 17-19 thus also require—a "ring member" as follows:

> a ring member having a circumference adapted to seat about an aortic wall surrounding an aortic channel, said ring including an aperture for blood flow therethrough;

A475(8:1-3).

Norred does not argue—nor could he—that the express terms of the claim require a "pliable" ring member.  Rather, he argues that a "pliable" limitation should be read in because the specification discloses embodiments with "pliable" ring members, and because, as a factual matter, *only* pliable ring members can be "adapted to seat about an aortic wall."  Opening Br. 42-43.  Norred argues that his construction "derives directly from the specification," *id.* at 42, attempts to support his argument with citations to the specification and to the declaration of his expert Dr. Catchings—who also relied on the specification and the factual contention that *only* pliable ring members can be "adapted" as the claims

require.  As with the DiMatteo patent's disclosure, Norred's brief on appeal reiterates arguments he made below, without addressing the Board's analysis or the evidence weighing against his position.  Norred fails to demonstrate that his construction is correct, let alone the broadest reasonable interpretation.

As the Board noted, nothing in the text of the claims indicates that the "ring member" must be made of any particular material.  A179-80.  Neither side argued that claim 16 contains terms of art, that the specification supplies a special definition for "ring member," or that Norred disclaimed non-pliable "ring members."  As this Court has repeatedly noted, with two exceptions not argued for here, "[t]he words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."  *See Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Norred's references to disclosures in the specification of "pliable" ring members fail to demonstrate that the words of claim 16 are *limited* to pliable ring members.  The claims, not the specification, define the scope of the patent.   35 U.S.C. §§ 112(b) (claims define the invention), 282(a)

(validity assessed on a claim-by-claim basis). *Johnson & Johnston Assocs.*

*v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc) ("[A]

patent applicant defines his invention in the claims, not in the

specification.  After all, the claims, not the specification, provide the

measure of the patentee's right to exclude").  It is thus a fundamental

principle of claim construction that while the specification provides *context*

for interpreting the claims, it is improper to read *limitations* from the

specification into the claims.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323

(Fed. Cir. 2005) (en banc); *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d

1367, 1371 (Fed. Cir. 2014) ("While we read claims in view of the

specification, of which they are a part, we do not read limitations from the

embodiments in the specification into the claims.").  This case is a good

illustration of that principle—the parties agree that claim 16's scope

*includes* "pliable" ring members disclosed in the specification, but Norred

provides no basis for *limiting* claim 16 to pliable ring members.

The record, moreover, refutes Norred's factual contention that *only*

pliable ring members can be "adapted to seat about an aortic wall."

Medtronic's expert Dr. Hill explained—in his declaration filed with

Medtronic's petition—that Norred and Dr. Catchings were wrong as a

factual matter.  Making the "ring member" of a functioning heart valve "pliable" is one way to "adapt[]" it "to seat about an aortic wall," but not the only possible way.  The aorta is pliable, and other possible "adaptations" include adjusting the surface area of the ring or adjusting the amount of contact with the aorta:

> For example, while pliability could be a factor relating to a sealing function, heart valve seals are often created with relatively rigid ring structures.  This can be easily achieved because the aorta itself is pliable and will conform to the shape of a relatively rigid heart valve ring member.  In addition, besides pliability, several other factors relate to a sealing function with the aorta, such as the surface area of the ring and amount of contact with the aorta.

A1470-71.  Moreover, Dr. Hill explained that a person of skill in the art would not understand the claims to imply a "pliability" limitation, A1470-71, and that "pliable" is a relative term that would only make the claims less understandable to a person of skill in the art.  A1471.  Norred's expert declaration simply registers disagreement with Dr. Hill, A2184-85, and Norred's brief on appeal fails to mention Dr. Hill's declaration at all in discussing the construction of "ring member."  To the extent Norred's expert declaration is relevant, at most it raises a dispute of fact as to the understanding of a person of skill in the art—on which the Board was entitled to credit Medtronic's expert over Norred's.  *Cf. Teva*, 135 S. Ct. at

841 (disputes between experts regarding the knowledge of a person of skill in the art are questions of fact, reviewed deferentially on appeal).

In sum, the Board correctly declined to read a "pliable" limitation into the claims, and Norred fails to demonstrate error in that ruling.

## II.   The Board Correctly Denied Norred's Motion to Amend.

### A.   Legal Standards for Motions to Amend in *Inter Partes* Reviews

*Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292 (Fed. Cir. 2015), is the Court's leading case concerning motions to amend claims in *inter partes* review proceedings (IPRs).  A patent owner in an IPR may file one motion to amend the patent.   35 U.S.C. § 316(d).   The effect of an "amendment" is far more significant in *inter partes* review than reexamination.

In reexamination, unlike IPRs, granting a "motion to amend" is an incremental step in the process.   The examiner enters a proposed amendment, and examination continues on the proposed amended claim, which may be rejected later (or not) on other grounds.  In an IPR, however, granting a motion to amend has the effect of *amending the issued patent*, and "the substituted claims are not subject to further examination." *Proxyconn*, 789 F.3d at 1307. Close scrutiny of motions to amend is thus

50

particularly important IPRs because the PTAB's consideration of the motion is the Patent Office's only opportunity to examine the proposed amended claims.  *Id.* at 1307-08.

A patent owner moving to amend a claim in an IPR must identify the proposed changes, and must "come forward with technical facts and reasoning about those feature(s), including construction of new claim terms, sufficient to persuade the Board that the proposed substitute claim is patentable over the prior art of record, and over prior art not of record but known to the patent owner."  *Id.* at 1304 (quoting *Idle Free Sys., Inc. v. Bergstrom, Inc.*, IPR2012-00027, 2013 WL 5947697 (P.T.A.B. June 11, 2013) (six-member panel)); *see also MasterImage 3D, Inc. v. RealD Inc.*, No. IPR2015-00040, slip op. at 1-3 (P.T.A.B. July 15, 2015) (Paper 42) (six-member panel, clarifying *Idle Free* and movant's duty to show patentability of proposed amended claim); *Torrent Pharms., Ltd. v. Mylan Pharms Inc.*, IPR2014-00784, 2015 WL 5719630, at *19-20 (P.T.A.B. Sept. 24, 2015).  As with most motions in adversarial proceedings, the movant bears the burden to show entitlement to relief.  *Proxyconn*, 789 F.3d at 1304; 37 C.F.R. § 42.20(a), (c).  A motion to amend may be denied where, *inter alia*, it would enlarge the scope of the claims.   37 C.F.R.

§ 42.121(a)(2); *see also* 35 U.S.C. § 316(d); *Proxyconn*, 789 F.3d at 1304.

A proposed amendment impermissibly enlarges the scope of a claim if it broadens the claim *in any way*—if it "contains within its scope any conceivable apparatus or process which would not have infringed the original patent." *Cuozzo*, 793 F.3d at 1283; *see also* 37 C.F.R. § 42.121(a)(2); 35 U.S.C. § 316(d).

### B. The Board Correctly Denied Norred's Motion to Amend Claim 16.

The Board correctly concluded that Norred's proposed amendment would impermissibly broaden the scope of claim 16. A20-22.

Norred proposed to remove the "means for mounting" limitation and to replace it with different, broader language that did not use means-plus-function format and did not require any particular structure:

> ~~means for mounting~~ said first open end of said membrane <u>hingedly secured</u> about said ~~ring~~ aperture <u>of said ring member</u> with said second open end displaced therefrom, ~~said means moving~~ said ~~membrane~~ second <u>open</u> end <u>movable</u> between a first open position to allow a blood flow therethrough and a second closed position to preclude blood flow therethrough;

A260-61.

Means-plus-function limitations are expressed as "a means … for performing a specified function," and "construed to cover the corresponding

structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(f). Section 112(f) offers patentees a "bargain" or "exchange" where the patentee may draft claim elements in purely functional terms, but those elements will be construed narrowly.[8]

The Board's final written decision construed the "means for mounting" limitation to mean "fingers or arms hingedly attached or hingedly secured to the ring member and a free end spaced therefrom," consistent with the disclosures in the specification. A7-8. As explained above, *Statement of the Case § B, supra*, and as Medtronic argued to the Board, claim 16 corresponds to the conical valve embodiments in the specification. A290-91; A313-14; A1496-1504. In the conical embodiments, it is the "fingers 68" or "arms 84," "hingedly" "attached" or "secured" to the ring at one end that perform the claimed function. The valves open and close when the fingers or arms move about the hinges and cause one end of

---

[8] *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) ("[T]his flexibility in claim drafting comes at a price[—s]uch claims are construed to cover *only* 'the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.'" (quoting *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-48 (Fed. Cir. 2015) (en banc)) (emphasis added); *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003) ("the quid pro quo for the convenience of claiming in functional terms").

the membrane to open or close. A473(4:54)-A474(5:14) (conical embodiment of figures 10-13); A474(5:33-47) (conical embodiment of figures 14-17).



**A469**                    **A470**

As the Board also noted, its construction was consistent with claim 17, which recited that the structure of the mounting means "comprises at least one arm having a first end hingedly secured to said ring member and a free end spaced therefrom." A8.

Based on that claim construction, denial of Norred's motion was a straightforward matter. Norred's proposed amendment would have removed the requirement of "fingers" or "arms" (the "structure" or "material" that 35 U.S.C. § 112(f) requires) and simply claimed a "membrane hingedly secured" by any means at all—thus broadening the claim. A21. A claim amendment that rescinds the bargain of § 112(f) and

54

takes a claim element out of means-plus-function format will usually broaden the claim. *See Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1260 (Fed. Cir. 1999) ("Claim treatment outside of the requirements of § 112, ¶6 generally gives the claims broader scope."). Norred's proposed amendment was no different, and the Board properly denied Norred's motion. Norred's contrary arguments are unsound.

*First*, Norred contends that the Board's final decision is "bereft of any suggestion that it attempted to define the function of the claim limitation." Opening Br. 25. Claim 16 explicitly states, however, that the function of the claimed "means" is "mounting said first open end of said membrane about said ring aperture," and "moving said membrane second end between a first open position … and a second closed position." A475(8:7-11). Medtronic's briefs noted that simple point below. A313; A1569. The Board stated that it "agree[d] with Petitioner's analysis," A7, and did not need to repeat the analysis at length.

The "function" Norred asserts in its brief lacks merit and is not an argument Norred made below. "From a functional standpoint," Norred states, "the 'means for mounting' limitation requires the first open end of the membrane to be *attached to* the ring member … in such a manner that

the *second open end can move* between an open position and a closed position to regulate the flow of blood." Opening Br. 25-26 (emphasis added). That argument is inconsistent with the claims in at least two ways. Claim 16 recites a "means for mounting… *said means moving said membrane second end* between a first open position … and a second closed position." A475. Under 35 U.S.C. § 112(f), that must refer to a *structure* that actually moves the membrane's second end, not one that is merely attached to something else "in such a manner that the *second open end can move* between an open position and a closed position." Opening Br. 25-26. To argue that a means-plus-function element refers to *any* structure that merely *allows* a function to happen is to read the claims to require no structure at all, contrary to the language of § 112(f). Moreover, even Norred's suggestion of an "attachment" is wrong. Claim 16 recites that the first open end is "*mount[ed] … about* said ring aperture," A475 (emphasis added) not "*attached to* the ring member." Opening Br. 25 (emphasis added).

*Second*, Norred asserts that claim 16 covers not just the conical embodiments of figures 10-17, but also the "cadaver/porcine" embodiment of figures 18 and 19. Opening Br. 28-29. That is incorrect, as Medtronic

explained below. *See, e.g.*, A1504. The '228 patent's written description

discusses four embodiments: an "umbrella" valve, two "conical" valves,

and a "cadaver/porcine" valve. *Statement of the Case §B, supra.* Claims

12-15 generally correspond to the umbrella valve embodiment, as they

recite a membrane, with "ribs" (i.e., the umbrella spokes), that moves

between "unfolded" and "collapsed" "positions." A475(7:38-43). Claims 20-

24 generally correspond to the "cadaver/porcine" valve embodiment, as

they claim "a *tissue* valve having an interior member made of a tissue

material," A475(8:30-33) (emphasis added). Moreover, consistent with the

written description's statement that the valve is "retained in a base ring,"

A474(6:1), claims 20-24 recite that the "ring member *surround[s]* said

tissue valve," without reciting any structure to "mount" any part of the

valve "about" the ring. A475(8:33) (emphasis added).

Claim 16 cannot correspond to the umbrella or cadaver/porcine

embodiments. Claim 16 recites a "membrane" with "first and second

spaced-apart open ends," where the first end is "mount[ed] … about" the

"ring aperture," and the second end is moved between an "open position"

and a "closed position." A475. Further, the first end is "mounted"—and

the second end is "moved"—by a *separate structure* that claim 16 recites as

57

a "means for mounting," and that the specification discloses as "fingers" or "arms." A475 (claim 16); A7-8, A21 (final decision, quoting patent).

The cadaver/porcine embodiment does not have the claimed "membrane" or the claimed "means." It uses three leaflets that converge and separate in response to pressures from the heart. A474(5:63-6:8); A471. Norred's brief refers to the leaflets as "membranous," Opening Br. 28, but "membranous" or not, the three leaflets are plainly not a "membrane" with "first and second spaced-apart open ends" as claimed in claim 16. And even if they were, nothing in the written description or drawings of the cadaver/porcine embodiment discloses a *structure* for "mounting" any part of that embodiment to a ring or "moving" any part of the valve between an open and closed position. As to "mounting," the written description merely states, in passive voice devoid of structure, that the valve "is retained in a base ring." A474(6:1). As to moving, there is no structure; only moving tissue. Norred's argument that claim 16 covers the conical embodiment *and* the cadaver/porcine embodiment attempts to fit the proverbial square peg into a round hole. Where the cadaver/porcine embodiment actually fits is claims 20-24, which claim "tissue" valves, and which conspicuously do not require any separate structure in the nature of

the "fingers or arms" to "mount" the valve to the ring member or to "move" any part of the valve between an open and closed position.  A475.

*Third*, Norred argues that the Board's construction renders claim 17 redundant, as claim 17 recites "at least one arm" to perform the function recited in claim 16.  Opening Br. 30-31.  This Court rejected an indistinguishable differentiation argument in *Medtronic v. Advanced Cardiovascular Systems, Inc.*, 248 F.3d 1303, 1313 (Fed. Cir. 2001), stating that it is "settled law … that independent claims containing means-plus-function limitations *do not* have the same literal scope as dependent claims reciting specifically the structure that performs the stated function."  That is because the independent claim's literal scope includes the "equivalents" of the structures in the specification.  *Id.* (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991)).  And in any event, "claim differentiation is a rule of thumb that does not trump the clear import of the specification."  *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1323 (Fed. Cir. 2011).  Further, Norred chose to use the term "arms" for one embodiment and "fingers" for another.  If a dependent claim reciting "fingers" may be in some sense redundant with an independent means-plus-function claim properly construed to cover "fingers or arms,"

that would be the result of Norred's choice in drafting the patent.

*Finally*, Norred contends that the proposed amendment did not broaden claim 16 because a means-plus-function limitation includes not only structures identified in the specification, but also "equivalents thereof." 35 U.S.C. § 112(f); *see* Opening Br. 32-33. Norred contends that the proposed amendment—which requires a hinged attachment between the membrane and ring member, but no fingers or arms—is the equivalent of fingers or arms within the meaning of 35 U.S.C. § 112(f). Opening Br. 33. That argument is unsound. The Supreme Court has described structural equivalence under 35 U.S.C. § 112(f) as "an application of the doctrine of equivalents in a restrictive role." *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 28 (1997); *see also Odetics, Inc. v Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (quoting *id.*). It is well-established that even the broader doctrine of equivalents cannot be applied so broadly as to entirely read out or "vitiate" a claim element. *Warner-Jenkinson*, 520 U.S. at 29 ("It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."); *id.* at 39 n.8 ("if a theory of equivalence would entirely vitiate a particular

claim element, partial or complete judgment should be rendered by the court"). At bottom, Norred's contention is that "*no* fingers or arms" is an equivalent of "fingers or arms," Opening Br. 33, which would use equivalents to vitiate a claim element. That contention—for which Norred offers no support—cannot be correct under the doctrine of equivalents in its conventional role, let alone its "restrictive role" concerning the literal scope of means-plus function claims. *Warner-Jenkinson*, 520 U.S. at 28.

In sum, the Board concluded that Norred's proposed amendment would impermissibly expand the scope of claim 16. A20-22. Norred fails to demonstrate error in that ruling, and this Court should affirm.

It bears noting, moreover, that Medtronic's opposition to Norred's motion to amend gave five independently sufficient reasons to deny the motion to amend: (1) the proposed amendments would enlarge the scope of the claim, (2) the proposed amendments were not responsive to grounds of unpatentability, (3) Norred failed to provide constructions for important terms added to the claims, (4) Norred failed to show support in the specification for the substitute claim, and (5) Norred failed to show that the substitute claim is patentable. A306-25. The Board denied Norred's motion on the first ground, without reaching the other grounds. A19-22.

Thus, if the Court were to agree with Norred that the Board erred in resolving the first ground for denying Norred's motion to amend, the proper remedy would be a remand for consideration of at least the remaining grounds—not reversal as Norred requests. As explained above, however, the Board did not err, and its denial of Norred's motion to amend should be affirmed.

## CONCLUSION

For the foregoing reasons, the Board's final written decision should be affirmed.

November 6, 2015                    Respectfully submitted,

                                   /s/ John C. O'Quinn

Jack S. Barufka                    John C. O'Quinn
PILLSBURY WINTHROP                 William H. Burgess
   SHAW PITTMAN LLP                KIRKLAND & ELLIS LLP
1650 Tysons Blvd, 14th Floor       655 15th St., N.W.
McLean, VA 22102                   Washington, DC  20005
703-668-0664                       (202) 879-5000

Evan Finkel
PILLSBURY WINTHROP
   SHAW PITTMAN LLP
725 S. Figueroa St., Suite 2800
Los Angeles, CA 90017
213-488-7307

## CERTIFICATE OF SERVICE

On November 6, 2015, the foregoing brief was submitted to the Court through the CM/ECF system.  All participants in the case are represented by registered CM/ECF users and will be served electronically by the CM/ECF system.

*/s/ John C. O'Quinn*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

I certify that this brief complies with the type-volume limitation specified in Federal Rule of Appellate Procedure 32(a)(7).  According to the word processing system used to prepare this document, the brief contains **11,402** words.

*/s/ John C. O'Quinn*